IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| Charles Philip Toussaint, M.D., ) | C/A No.: 3:15-2778-MGL-SVH |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND RECOMMENDATION |
| Palmetto Health and Greta S. Harper, ) | |
| ) | |
| Defendants. ) | |
| ) | |

In this employment discrimination case, Charles Philip Toussaint ("Plaintiff") is suing his former employer, Palmetto Health, and Greta S. Harper ("Harper"), his direct supervisor (collectively "Defendants"). Plaintiff alleges the following remaining causes of action: (1) discrimination in violation of the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") and (2) defamation. [ECF No. 1-2]. This matter comes before the court on Defendants' motion for summary judgment. [ECF No. 41]. This motion having been fully briefed [ECF Nos. 47, 48], it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civ. Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district judge grant in part and deny in part Defendants' motion for summary judgment.

I.   Factual Background[1]

On July 1, 2010, Plaintiff began his career as a clinical neurosurgeon with University of South Carolina's Department of Neurosurgery as an Assistant Professor of Clinical Surgery. Pl. Dep. 7:11–25.[2] Plaintiff possessed medical privileges and performed his surgeries at Palmetto Health Richland. In February 2013, Palmetto Health acquired USC's Department of Neurosurgery, and Plaintiff became an employee of Palmetto Health in its neurosurgery practice. *Id*. at 8:5–10. During his employment with USC and Palmetto Health, Plaintiff established himself as a talented and skilled surgeon. Hamm Dep. 65:12–23;[3] Raymond Dep. 31:13–15;[4] Baskins Dep. 51:22–24.[5]

Prior to his employment by Palmetto Health's, but when he possessed medical privileges there, Plaintiff was cited for being rude and argumentative to staff. [ECF Nos. 41-3 at 1–4; 41-5 at 6–7]. Most significantly, on July 30, 2012, Plaintiff was paged by a resident to speak to the parents of a minor concerning their child's care. [ECF No. 41-3 at 6–10]. The parents had specifically requested to speak to the neurosurgeon, whom they had not seen previously that day. *Id*. After the parents' third request to speak to him, Plaintiff spoke to them over the phone, but told them that because they were patients of another doctor, he would only get involved if there was an emergency. *Id*. He did not answer their questions. *Id*. He also directed the resident never to page him again. *Id*. Six

---

[1] The court views the facts, as it must, in the light most favorable to the Plaintiff, pursuant to Fed. R. Civ. P. 56. However, where a witness's perception is relevant, the court makes no determination of whether the perception is accurate.
[2] Excerpts from Plaintiff's deposition may be found at ECF Nos. 41-2 and 46-2.
[3] Excerpts from Hamm's deposition may be found at ECF Nos. 41-6 and 47-2.
[4] Excerpts from Raymond's deposition may be found at ECF Nos. 41-8 and 47-4.
[5] Excerpts from Baskins' deposition may be found at ECF Nos. 41-10 and 47-5.

Palmetto Health executives met to discuss the incident and "previous events regarding Dr. Toussaint's conduct." *Id*. at 5. Plaintiff was placed on a Focused Professional Practice Evaluation ("FPPE") on October 3, 2012. *Id*. at 7.

Before the effective date of Palmetto Health's acquisition of the neurosurgery practice, Dr. James Raymond, its Chief Medical Officer at the time, and Dr. Ellis Knight met with Plaintiff to discuss his potential employment. Raymond Dep. 26:8–27:22, 31:2–16; Knight Dep. 17:9–18:8.[6] Raymond and Knight specifically told Plaintiff during their discussion that they were concerned about his misconduct, and wanted to ensure the behavior would not repeat itself if he became employed. *Id*. Plaintiff did not deny his misconduct, was contrite, and insisted the behavior was in the past and would not recur. Knight Dep. 18:9–17. Despite Raymond and Knight's concerns, Harper and Judith Baskins supported his hiring and believed that any behavioral issues could be corrected with a strong mentor. Knight Dep. 19:2–20:4; Harper Dep. 61:4–62:3;[7] Baskins Dep. 33:9–34:1. Palmetto Health ultimately chose to hire Plaintiff based on the recommendations of Harper and Baskins and the need for a neurosurgeon. Raymond Dep. 31:2–16; Knight Dep. 17:9–18:8.[8] On February 3, 2013, Plaintiff signed an Employment Agreement, effective for a one-year term beginning February 15, 2013. [ECF No. 41-3 at 12–29].

---

[6] Excerpts from Knight's deposition may be found at ECF No. 41-9.
[7] Excerpts from Harper's deposition may be found at ECF Nos. 41-4 and 47-3.
[8] Excerpts from Knight's deposition may be found at ECF No. 41-9.

Throughout his employment, Plaintiff's interactions with other Palmetto Health employees often created friction. Witnesses for Defendants noted the following miscellaneous issues related to Plaintiff that were addressed informally:

- Treatment of staff: On September 10, 2013, Plaintiff was performing a craniotomy and the staff members could not assemble the drill. Pl. Dep. 87:12–89:3. According to Plaintiff, he raised his voice at the OR nurse and demanded that they find the appropriate staff that could fix the drill, as the patient was under anesthesia with her skull exposed. *Id*. The OR nurse made a complaint about Plaintiff, alleging he screamed and yelled at her. [ECF No. 41-5 at 5].

- Inappropriate relationship with Crouch: Neurosurgery Practice Manager Meg Pearce stated that numerous members of the OR staff "reported that they were uncomfortable with Plaintiff's relationship with his Nurse Practitioner Melissa Crouch, which they described as unprofessional and unfitting for the workplace." Crouch Aff. ¶9. Pearce spoke to Plaintiff and Crouch about the appearance of impropriety and made clear that the relationship should be work-appropriate. *Id*.

- Excessive discussion of money: There were several reports of Plaintiff's preoccupation with money, both in casual conversations and in the practice he was trying to build. Harper Dep. 245:12–246:7; Hamm Dep. 62:4–12; Pearce 1 Aff. ¶5; Molloy Aff. ¶6. Webb 2 Aff. ¶5  [ECF No. 48-4].[9]

- Openly discussed other employment offers: Plaintiff openly discussed that he was exploring other job opportunities. Harper Dep. 78:8–13; Hamm Dep. 158:20–159:4; Baskins Dep. 54:6–10.

- Banning staff from the OR: Hamm Dep. 127:18–128:16. Plaintiff denied "banning" anyone from the OR, but admits that he had advised that he must have trust in all staff in the OR and that there were several instances in which he asked that staff not be assigned to his OR. Pl. Dep. 91:19–93:6, 127:23–128:17.

- Manipulation of work: On July 16, 2014, it was reported that Plaintiff was "gaming the system" by intentionally changing classifications of surgical procedures to note a degree of urgency that did not exist. [ECF No. 41-5 at 4].

---

[9] Plaintiff and Defendants provided separate affidavits from Practice Manager Meg Pearce and Dr. Sharon Webb, a neurosurgeon previously employed at Palmetto Health. "Pearce 1 Aff." may be found at ECF No. 41-8 and "Pearce 2 Aff." may be found at ECF No. 47-6. "Webb 1 Aff." may be found at ECF No. 47-7 and "Webb 2 Aff." may be found at ECF No. 48-4.

4

> This allowed Plaintiff to do more surgeries in less time and also delayed surgeries for patients with more critical needs.

Harper met with Plaintiff during the first half of 2014 in an attempt to renegotiate Plaintiff's employment contract; however, negotiations did not prove fruitful. Pl. Dep. 67:4–25. Plaintiff contacted Chuck Beaman, CEO of Palmetto Health, and asked that Harper be removed as the corporate representative for the negotiation his employment agreement, but his request was denied. *Id*. Plaintiff continued to be employed by Palmetto Health, but as an at-will employee without a contract.

By the summer of 2014, Jay Hamm, Chief Operating Officer of Palmetto Health Richland, was concerned about the neurosurgery department because of complaints he had heard both from and about Plaintiff, and he decided to personally investigate. Hamm Dep. 69:7–70:16; 75:9–13. Hamm scheduled a meeting with all members of the neurosurgery OR staff and excluded managers and surgeons from the meeting with the intent of obtaining candid and complete opinions from the staff. *Id*. They had experienced turnover recently, and Plaintiff had complained that Head Nurse Greta Kennedy was not competent. *Id*. Hamm discovered there were two factions: those who felt it was difficult to work with Plaintiff, and those who did not. *Id*. There was "no big outcry" against Kennedy or a feeling that a new manager was needed. *Id*. Hamm's conclusion at the end of the meeting was that Plaintiff was the biggest problem with the neurosurgery team. Hamm Dep. 168:13–21.

Also in the summer of 2014, Dr. Seth Molloy joined the neurosurgery group at Palmetto Health with the intent to develop a spine surgery practice. Molloy Aff. ¶¶2–4.

5

Military Leave

On December 5, 2014, Plaintiff emailed Harper and informed her that he would be deployed to Germany with his U.S. Army Reserve Unit for 90 days beginning May 29, 2015. [ECF No. 41-5 at 8–9]. Harper's responded "Well, I'm sure this is needed for the country but it sure is bad for us." *Id*. Harper then forwarded the notice to Hamm and Baskins. *Id*. at 10–12. In response, Hamm inquired about the status of Plaintiff's contract negotiations and Palmetto Health's plans for him. *Id*. Baskins responded by stating that Plaintiff had not signed his contract and that they suspected he was looking for other employment.[10] *Id*. Hamm replied by asking "can we make it easier for him." *Id*. Baskins then responded that Palmetto Health was reluctant to terminate Plaintiff because they were at "such a vulnerable stage with neurosurgery." *Id*.

Over the next few months, Palmetto Health began making preparations to accommodate Plaintiff's military leave, including determining whether it had an obligation to continue to pay Plaintiff during his leave. Corporate Dep. 47:2–48:7.[11] Based on her understanding at the time, Harper believed that Palmetto Health was obligated to continue paying Plaintiff his salary for the entirety of his leave under its

---

[10] In fact, Plaintiff was seeking employment elsewhere. Plaintiff had been engaged in serious discussions with Lexington Medical Center ("LMC") about developing a neurosurgery practice. Plaintiff informed LMC in an email on December 9, 2014, that his goal was to start at LMC on October 1, 2015, just over a month after his military leave was scheduled to end. [ECF No. 41-3 at 56]. He planned to notify Palmetto Health on July 1, 2015, while he was out for his military leave. *Id*. By February 11, 2015, Plaintiff was creating draft press releases for LMC to announce the neurosurgery practice. *Id*. at 59–60.

[11] "Corporate Dep." refers to Palmetto Health 30(b)(6) deposition, in which Harper and Curt Collins testified. Excerpts of the deposition may be found at ECF Nos. 41-11 and 47-12.

salary continuance policy. *Id*. Palmetto Health also began determining how it would cover patients and surgeries during his leave. Baskins Dep. 61:16–65:14. Meg Pearce, the practice manager for the neurosurgery practice, began identifying, recruiting, and engaging locum tenens ("locums") neurosurgeons to substitute for Plaintiff during his military leave of absence. Pearce 2 Aff. ¶10. Locums are part-time physicians who are hired on a limited basis to alleviate staffing shortages. *Id*. Palmetto Health, through Pearce's efforts, engaged several locums to substitute for Plaintiff during his deployment. *Id*. In addition, Palmetto Health decided to assign spinal surgeries that Plaintiff normally performed to Molloy. Baskins Dep. 63:19–64:1.)

Work Distribution

In January 2015, concerns arose regarding Plaintiff's hoarding of the locums' work to the disadvantage of Molloy. Pl. Dep. 131:15–32:5; Harper Dep. 180:1–23, 199:10–200:2; Molloy Aff. ¶¶9–10; Pearce 1 Aff. ¶¶12–14. Plaintiff was receiving most of the more financially-rewarding work from the locums. *Id*.; Harper Dep. 194:5–195:3-95. Plaintiff's colleagues suspected he was informing the locums to refer patients to him and not to Molloy. Molloy Aff. ¶9; Pearce 2 Aff. ¶12. Additionally, Plaintiff would arrive early on Monday morning, review the locums' cases from the weekend, choose the more desirable cases he wanted, and leave the remainder for Molloy. Molloy Aff. ¶9; Pearce 1 Aff. ¶12. Plaintiff also refused to perform shunt operations, asserting he did not feel competent to perform this type surgery, except in emergencies. Pl. Dep. 151:4–152:2. Accordingly, Molloy was left to handle all of the shunt operations, which themselves are less lucrative procedures and also occupied Molloy's time so that he could not perform as

7

many spine procedures, leaving more such procedures available to Plaintiff. Molloy Aff. ¶8; Pearce Dep. ¶13. Molloy voiced his concerns about Plaintiff to Pearce, and Pearce reported it to Harper. Molloy Aff. ¶10; Pearce 1 Aff. ¶14.

January 25, 2015 Incident

During a spinal fusion surgery, Athelstine Turner, a scrub technician, broke sterility in the procedure by allowing a knife or needle that was to be used in the procedure to touch an unsterile surface. Pl. Dep. 93:16–98:10. Later, Turner made a major error and dropped a bone collector that contained a piece of the patient's bone that was to be used in the surgery. *Id*. The bone dropped to the floor, making it unusable for the procedure because it had touched an unsterile surface. *Id*.; Crouch Dep. 11:10–12:12. According to the complaint Turner filed, Plaintiff said, "You're fucking up and you need to stop fucking up." [ECF No. 41-3 at 33]. Turner further complained that this was not the first time Plaintiff had used disrespectful language towards her. *Id*.

When Hamm, Harper, Baskins, and other administrators were informed of the incident, the consensus among the administrators was that they had to put a stop to Plaintiff's abusive behavior. [ECF No. 41-5 at 13–17]. According to Raymond, the incident was the "final straw" that led to the termination. Raymond Dep. 38:12–22. While Harper reviewed the incident as a personnel matter according to Palmetto Health's progressive disciplinary policy, Palmetto Health's Professional Practice Council (the "Council"), led by Dr. Eric Brown, reviewed the incident as a medical staff matter. Harper Dep. 131:13–132:25. The Council addresses conduct of all physicians on Palmetto Health's medical staff. Raymond Dep. 13:21–23.

8

On February 3, 2015, Harper and Jim Lathren, Chief Operating Officer of Palmetto Health Systems, met with Plaintiff to discuss the allegations of his unprofessional and abusive behavior. Pl. Dep. 117:18–118:6; ECF No. 41-5 at 19–20. Plaintiff acknowledged his profanity and claimed he would abide by the Standards of Behavior going forward, including avoiding the use of profanity. *Id*. Harper emphasized to Plaintiff that his behavior was disruptive to optimal team performance, could negatively impact quality and safety, and would not be tolerated in the future. *Id*. After consulting with Raymond and Baskins, Harper issued Plaintiff a written warning under Palmetto Health's disciplinary policy on February 17, 2015. Harper Dep. 169:16–170:7.

<u>Plaintiff's Termination</u>

In late February 2015, Molloy again contacted Harper to complain about Plaintiff. Molloy Aff. ¶¶12–13. Molloy told Harper that Plaintiff, unbeknownst to Molloy, had contacted one of Molloy's patients and recommended that the patient discontinue his relationship with Molloy and, instead, receive treatment at Duke University Medical Center. *Id*. Molloy knew nothing about the issue or Plaintiff's interference until he called the patient to discuss a biopsy report. *Id*. After this event—particularly in light of Molloy's prior frustrations with Plaintiff—Harper and others became concerned that Molloy may leave Palmetto Health due to the ongoing issues with Plaintiff. Harper Dep. 249:17–25; Baskins Dep. 167:21–168:17. Harper contacted Dr. Skarli, the only other neurosurgeon in the practice at the time, to assess the extent of Plaintiff's problems with his colleagues. Harper Dep. 250:14–251:25. Skarli confirmed the issues with Plaintiff, describing him as concerned only for his own best interests and having one foot out the

9

door. *Id*. Harper testified that hearing from Molloy was the "nail in the coffin" when she "came over to the side with all my other administrative peers and said, despite the vulnerability from being short-staffed, that we had no choice but to proceed with separation." *Id*. at 250:7–13.

The decision to terminate Plaintiff was made in a meeting on or around February 24, 2015, that was attended by Harper, Baskins, Lathren, and Raymond. Baskins Dep. 123:3–24; Raymond Dep. 45:4–15. Plaintiff's military deployment was discussed during the meeting. According to Raymond, Plaintiff's military leave was "a fact, a brute fact that had to be taken into account" in the termination decision. Raymond Dep. 35:14–38:3. Baskins testified that Plaintiff's military leave was discussed because they had to discuss coverage for neurosurgery, and, because they had been preparing for his absence, there was already a plan to support patient care. Baskins Dep. 126:22–127:15.

On February 26, 2015, Plaintiff met with Harper, Raymond, Baskins, and Ashley Raffinie, Palmetto Health's Human Resources Business Partner. [ECF No. 41-3 at 37–39]. Harper informed Plaintiff that Palmetto Health was terminating his employment, but that Palmetto Health would label Plaintiff's separation as voluntary and "without cause" so as to minimize the adverse impact that his termination would have on future employment opportunities. *Id*.

Post-Termination

On February 27, 2015, Palmetto Health issued a "Talking Points" memorandum to its neurosurgery staff to use in fielding questions pertaining to Plaintiff. Harper Dep. 216:25–217:19. Palmetto Health also sent a letter to Plaintiff's patients and the practice's

10

referral sources to notify them of his departure. *Id*. Because Plaintiff did not have other employment at that time, the documents did not have information related to Plaintiff's relocation. Plaintiff acknowledges that the letters to patients and physicians were accurate. Pl. Dep. 261:16–18; 268:20–22. With regard to the Talking Points, Plaintiff complains that they created an implication of patient abandonment and they instructed Palmetto Health employees to indicate that they did not know the details of his departure. *Id*. at 266:2–17.

II.   Discussion

    A.     Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-

moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

    B.    Analysis

        1.    USERRA

In a USERRA case, "'there must be an initial showing by the employee that military status was at least a motivating or substantial factor in the [employer] action, upon which the [employer] must prove, by a preponderance of evidence, that the action would have been taken despite the protected status.'" *Bunting v. Town of Ocean City*, 409 F. App'x 693, 695 (4th Cir. 2011) (quoting *Sheehan v. Dep't of the Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001)). To establish a certain factor as a motivating factor, a claimant need not show that it was the sole cause of the employment action, but rather that it is one of the factors that a truthful employer would list if asked for the reasons for its decision. *Brandsasse v. Suffolk, Va.*, 72 F.Supp.2d 608, 617 (E.D.Va.1999); *see Price Waterhouse v. Hopkins*, 490 U.S. 228, 250 (1989) (explaining what causes a factor to be a motivating factor in a discrimination claim).

Here, Plaintiff has met his burden of establishing an initial showing that his upcoming deployment was a motivating factor in his termination. First, the temporal proximity of his notification to Defendants on December 5, 2014, of his upcoming deployment was less than three months prior to his termination. Additionally, his termination was approximately three months prior to his expected deployment.

Defendants argue that temporal proximity is insufficient to show Plaintiff's military status was a motivating factor. [ECF No. 41-1 at 27]. However, here it is combined with additional evidence. When Plaintiff first notified Harper of his upcoming deployment, she replied "Well, I'm sure this is needed for our country but it sure is bad for us." [ECF No. 41-3 at 36]. Additionally, when Harper forwarded Plaintiff's notification of upcoming deployment to Baskins, Wigg, and Hamm, it sparked a discussion of the status of Plaintiff's contract negotiations. [ECF No. 41-5 at 10–12]. Plaintiff's contract had expired ten months prior and no agreement had been reached. Baskins responded that Plaintiff had not signed a contract and she suspected he was actively looking elsewhere, to which Hamm responded "Can we make it easier for him?" *Id.* While Hamm's statement was related to the contract negotiations, Defendants can not dispute that the discussion of Plaintiff's continued employment was sparked by his notification of military deployment. Finally, Hamm and Baskins admitted that Plaintiff's upcoming deployment had been discussed in the decision to terminate him, although they insisted it was only related to patient care in Plaintiff's absence. Raymond Dep. 35:14–38:3; Baskins Dep. 126:22–127:15. The undersigned finds, for purposes of his prima facie case, Plaintiff has met his burden of showing that his deployment was a motivating factor in the decision to terminate him.

    Plaintiff's having established a prima facie case, the burden shifts to Defendants to show that they would have terminated Plaintiff independently of his military leave. The undersigned finds that there is a genuine dispute of fact about whether Defendants would have terminated Plaintiff independently of the deployment. Certainly, Defendants have

provided ample evidence that they would have had reason to terminate Plaintiff based on his conflicts with staff, conflicts with his partner, his refusal to sign a contract with Palmetto Health, and his indication to Harper that he was exploring job opportunities elsewhere. However, Defendants' own evidence shows that almost all of the problems and complaints they had with Plaintiff had existed for months, if not years. Although Raymond testified that Plaintiff's reaction when a nurse dropped a bone graph was the "the last straw," Harper addressed that issue with Plaintiff and gave him a written warning on February 17, 2015.

Harper testified that Molloy's complaints, particularly his complaint that Plaintiff had independently contacted and referred one of Molloy's patients to Duke University without discussing it with Molloy, was the "nail in the coffin." Harper Dep. 250:7–13. Baskins' testimony indicates that: (1) this information came to light after Plaintiff's written discipline on February 17, 2015; (2) Baskins had a call with Harper and Molloy upon being advised of Plaintiff's referral of Molloy's patient to Duke; and (3) Baskins and Harper viewed this action as a serious professional breach and were concerned that it might cause Molloy to leave the practice. Baskins Dep. 166:3–168:17, 171:16–173:10.

The undersigned finds that under the unique facts of this case, the determination of whether Plaintiff's expected military deployment was a motivating factor for his termination is a question for the jury. On one hand, if Defendants were searching for a pretextual basis to terminate Plaintiff, Harper could have terminated him on February 17, 2015, instead of giving him only a written warning. On the other hand, Defendants' concerns about being short-staffed appear to be a large reason they did not previously

14

terminate Plaintiff,[12] and his military leave forced them to resolve that issue. Therefore, his military leave may have eliminated a motivating reason for continuing to employ him. The determination of this question will likely turn on the credibility of the witnesses, which the undersigned may not assess on a motion for summary judgment. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568–69 (4th Cir. 2015). Therefore, the undersigned recommends Defendants' motion for summary judgment be denied as to Plaintiff's USERRA claim.

    2.    Defamation

Plaintiff asserts a defamation claim against Defendants. To recover for defamation under South Carolina law, the complaining party must show: (1) a false and defamatory statement was made; (2) the unprivileged statement was published to a third party; (3) the publisher was at fault; and (4) either the statement was actionable irrespective of harm or the publication of the statement caused special harm. *Fleming v. Rose*, 567 S.E.2d 857, 860 (S.C. 2002).

Under South Carolina law, "a defamatory insinuation may be made by actions or conduct as well as by word." *Tyler v. Macks Stores of South Carolina, Inc.*, 272 S.E.2d 633, 634 (S.C. 1980). Defamation "need not be accomplished in a direct manner" and a "mere insinuation is as actionable as a positive assertion if it is false and malicious and the meaning is plain." *Id.* "The meaning of a communication is that which the recipient correctly, or mistakenly but reasonably, understands that it was intended to express."

---

[12] Harper Dep. 250:7–13; Hamm Dep. 158:4–11; Raymond Dep. 31:11–16; Knight Dep. 20:16–21:13; Baskins Dep. 63:11–64:14.

15

*Cooper v. Lab. Corp. of Am. Holdings, Inc.*, 150 F.3d 376, 381 (4th Cir. 1998) (quoting *Restatement (Second) of Torts § 563* in defamation case under South Carolina law). Therefore, while truth is a complete defense to defamation, an untrue innuendo or inference drawn from the true statement may nonetheless give rise to liability. *See Adams v. Daily Tel. Co.*, 356 S.E.2d 118, 122 (S.C. Ct. App. 1986). The inference must, however, be reasonable. *Fountain v. First Reliance Bank*, 730 S.E.2d 305, 310 (S.C. 2012). "[T]he intent and meaning of an alleged defamatory statement must be gathered not only from the words singled out as libelous, but from the context [of the entire publication]." *Erickson v. Jones Street Publishers*, LLC, 629 S.E.2d 653, 674 (S.C. 2006).

Here, Plaintiff does not argue that the literal words of the patient notification letter were untrue and points to no particular oral communication that was untrue. Instead, Plaintiff first argues that the "patient notification letter and/or communications with Palmetto Health staff created the impression that [Plaintiff] had abruptly abandoned his practice and his patients." [ECF No. 46 at 37]. Plaintiff submitted affidavits of patients that felt that they had been abandoned upon being unable to contact Plaintiff. [ECF Nos. 46-3 – 46-6].

Plaintiff has not provided the court with any cases utilizing South Carolina law to support a defamation claim under these circumstances. The South Carolina Supreme Court has held that for statements to be considered defamatory, the alleged defamatory construction must be reasonable and "not extend to purely conjectural interpretations." *Fountain*, 730 S.E.2d 305, 310 (S.C. 2012) (affirming summary judgment on a

16

defamation claim where a bank representative stated that the bank would not give a loan if Plaintiff were involved in the business); *c.f. Adams v. Daily Telegraph Co.*, 356 S.E.2d 118, 119–20 (S.C. Ct. App. 1986) (reversing the trial court's grant of summary judgment in favor of two television stations after broadcasting a press conference where the family of two murdered stepbrothers suggested other members of the family undergo "truth testing" regarding the unsolved murders and inviting the public "draw their own conclusion" from other family members' refusal to cooperate). Here, Defendants did not imply that Plaintiff had abandoned his patients. They did not provide information as to Plaintiff's future plans, as they did not possess such information. To the extent Plaintiff's patients formed assumptions that Plaintiff had abandoned his patients after Defendants' written or oral communications, such assumptions are not reasonable based on the record before the court.

Plaintiff next contends that Defendants made actual false statements. [ECF No. 46 at 37]. In so arguing, Plaintiff claims that Curt Collins, Practice Administrator, knew by March 13, 2015, of Plaintiff's new practice at LMC. [ECF No. 46 at 16; 46-1 at 9]. Plaintiff argues that Collins did not inform Palmetto Health employees of Plaintiff's plans and they continued to tell patients that they did not know how to contact Plaintiff.[13] However, the evidence shows only that Plaintiff requested Collins to speak to John Moore of LMC regarding transportation of Plaintiff's personal office items. *Id*. Defendants are not required, and arguably not permitted, to make assumptions about the

---

[13] Plaintiff cites deposition to pages 150–153 of Collins' deposition testimony for this proposition, but these pages are not included in the exhibits. For purposes of this motion, the undersigned assumes Plaintiff's assertion is supported by the record.

status of Plaintiff's employment based on the transportation of his personal office items. In fact, Plaintiff was not employed by LMC on March 13, 2015, as Plaintiff admits that he did not enter into an employment contract until March 23, 2015, and his employment did not commence until April 6, 2015. Pl. Dep 276:9–14; Moore Dep. 37:19–21. There is no evidence that Plaintiff clearly stated his new employment, provided any contact information for his new practice, or advised Defendants when his new employment would start.

As Plaintiff has not provided evidence of any statement by Defendants that is either false or has a defamatory insinuation, the undersigned recommends Defendants be granted summary judgment on Plaintiff's defamation claim.

III.   Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendants' motion for summary judgment be denied as to Plaintiff's USERRA claim and granted as to his defamation claim.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

April 3, 2017                                                               Shiva V. Hodges
Columbia, South Carolina                                      United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).